# In the United States Court of Federal Claims

**No. 15-16C**
**(Filed Under Seal: November 27, 2019)**
**Reissued: December 20, 2019[1]**

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * | | |
| | * | **Motion for Summary Judgment;** |
| **AUTHENTIC APPAREL GROUP, LLC,** | * | **Breach of Trademark Licensing** |
| | * | **Agreement; Breach of Duty of** |
| **Plaintiff,** | * | **Good Faith and Fair Dealing.** |
| | * | |
| **v.** | * | |
| | * | |
| **THE UNITED STATES,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * | | |

J. Joseph Bainton, Dunnegan & Scileppi, LLC, 350 Fifth Avenue, Suite 7610, New York, New York 10118, for Plaintiff.

Joseph H. Hunt, Robert E. Kirschman, Jr., Douglas K. Mickle, Alexander O. Canizares, and Borislav Kushnir, United States Department of Justice, Commercial Litigation Branch, Civil Division, P.O. Box 480, Ben Franklin Station, Washington, D.C. 20044, for Defendant. James M. Ives and Laurel Q. Simmons, United States Army Legal Services Agency, 9275 Gunston Road, Fort Belvoir, VA 22060, Of Counsel.

---

## OPINION AND ORDER

---

**WILLIAMS,** Senior Judge.

This matter comes before the Court on the parties' cross-motions for summary judgment. Plaintiff claims the Army breached a trademark licensing agreement by denying Authentic Apparel Group, LLC ("Authentic") the right to fully exploit Army trademarks and by failing to approve

---

[1] An unredacted version of this opinion was issued under seal on November 27, 2019. The parties were given an opportunity to propose redactions, and those redactions are included herein, substituting agreed-upon descriptions, in lieu of protected information, in bold type and in brackets.

advertising featuring Authentic's spokesperson, Dwayne "The Rock" Johnson. [2]  Authentic further claims the Army breached the Agreement by refusing to permit Authentic to truthfully advertise its relationship with the Army's Morale, Welfare and Recreation Fund.  Finally, Plaintiff claims that the Army violated the duty of good faith and fair dealing by preventing Plaintiff from both obtaining financing for a footwear line and reselling womenswear garments.  Defendant cross moves for summary judgment on all counts and seeks summary judgment on its counterclaim for nonpayment of royalties.

For the reasons explained below, Plaintiff's motions for summary judgment are denied, and Defendant's cross-motions for summary judgment are granted.   Authentic has not demonstrated that the Army acted unreasonably in rejecting apparel or advertising.   The Licensing Agreement expressly gave the Army broad discretion to approve or reject both Authentic's proposed use of Army trademarks and the advertising of items bearing those trademarks.  Further, Authentic was attempting to exaggerate the role of the Army's Morale, Welfare and Recreation Fund—suggesting a portion of sales proceeds were a charitable contribution to this fund when they were not.  So too, Plaintiff has failed to establish that the Army prevented it from obtaining financing for the footwear line by unduly delaying approval of its financing deal.  Finally, the Army owed Plaintiff no duty with respect to the womenswear garments as these garments were not covered by the Licensing Agreement at issue—they had been subject to an earlier agreement between the Army and a defunct, bankrupt company.   The womenswear garments were never transferred to Authentic, were subject to a warehousemen's lien, and any proceeds from their disposition were governed by a Bankruptcy Court order.

As to Defendant's counterclaim, there is no dispute that Plaintiff failed to pay royalties— the only issue is quantum.  As such, Defendant's counterclaim is granted as to liability, and the record remains open for proceedings on quantum.

### Background[3]

The Army Trademark Licensing Program was established in 2006, to develop and administer policies and procedures for the licensing of Army marks in accordance with Section 1004 of the Defense Authorization Act of 2005.  The Act authorized the Army and other military departments to license trademarks and receive fees from licensing.  According to Department of Defense Directive 5535.09, "DoD Branding and Trademark Licensing Program," the objectives of trademark licensing include "[e]nhancing the name, reputation and public goodwill of the DoD Components through a broad brand promotion and licensing program that provides quality branded products and services at reasonable prices."  Def.'s Mot. Summ. J. at A1288.

---

[2]     Plaintiff filed two motions seeking summary judgment, one on Counts I through IV and a cross-motion on Count V.  Defendant filed cross-motions for summary judgment on Counts I through IV and a motion to dismiss Count V, which was converted into a motion for summary judgment.

[3]     This background is derived from the exhibits to the parties' summary judgment papers.  Grammatical and typographical errors in quotations have not been corrected.

On October 1, 2009, the Army contracted with The Beanstalk Group, LLC ("Beanstalk"), a licensing agency headquartered in New York City, to assist in managing the Army's trademark licenses in exchange for a percentage of royalties the licensees paid to the Army.  Beanstalk's contract allowed it to act as the Army's nonexclusive agent "to license the use of indicia on merchandise sold."  Id. at A127.  Beanstalk's contract had a one-year term with four one-year option periods.  Beanstalk was responsible for initial review of submissions and any communication with licensees that occurred during the approval process, but the Army had to provide advance written approval before a licensee could sell any item.  Id. at A125-40, A1196.

### The Army's 2007 Licensing Agreement with All American Apparel

Plaintiff Authentic was formed in April 2010, as a limited liability company under the laws of the state of New York.  Id. at A565, A318.  At that time and continuing throughout this proceeding, Ron Reuben was Authentic's founder and chairman.  Id. at A570.  Prior to the creation of Authentic, Mr. Reuben ran a company called All American Apparel Company, Inc. ("All American"), which made Army-trademarked apparel, including womenswear bearing the First Infantry unit insignia, under a licensing agreement executed on June 25, 2007.  Id. at A1291.

Under this 2007 agreement, the Army granted All American a nonexclusive license to use Army logos on clothing to be sold within the United States.  Id. at A1291, A1323.  The initial term of the licensing agreement was from March 15, 2007 to December 31, 2010, with an option for All American to renew for an additional two-year period provided that All American pay the Army at least $300,000 in royalty payments by December 31, 2009, and agree to specified new royalty rates for the next year.  Id. at A1293, A1316.  Under Section 5 of the 2007 agreement, All American was required to obtain the Army's approval of any clothing, design, label or promotional or marketing content prior to making sales, and the Army had discretion with respect to how the Army's trademarks appeared.  Id. at A1299.

The 2007 agreement covered men's, women's, and children's apparel and certain shoes and boots.  Id. at A1316.  Royalty payments for each contract year[4] until All American reached $5,000,000 in annual net sales were to be 8% for regular sales, 11% for FOB ("Free on Board") sales, and 10% for distributor sales.  Id. at A1316-17.  After All American achieved in excess of $5,000,000 in net sales for a contract year, the royalty rates for subsequent net sales would be 5% of regular sales, 7% for FOB sales, and 6% for distributor sales.  Id. at A1317.

### All American's Bankruptcy and Sale of Some Assets to Plaintiff

In November 2008, prior to the end of the first year of the 2007 agreement, All American filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York.

In July 2010, All American asked the Bankruptcy Court to allow it to sell certain assets to a new company formed in April 2010, Plaintiff, Authentic, for $50,000.  The terms of the proposed sale of All American's assets to Authentic submitted to the Bankruptcy Court expressly excluded

---

[4]    The agreement specified three contract years: (1) March 15, 2007 through December 31, 2008; (2) January 1, 2009 through December 31, 2009; and (3) January 1, 2010 through December 31, 2010.  Id. at A1316.

All American's inventory.   IDS USA, Inc. ("IDS"), a creditor of All American, advised the Bankruptcy Court that it possessed a warehouseman's lien over inventory being housed in its West Coast warehouse arising out of unpaid storage fees All American owed.   In its proposed Order Authorizing Private Sale of Assets to Authentic, All American stated that as part of the sale of assets to Authentic Apparel, 50% of the inventory liquidation proceeds would be evenly distributed to pay All American's landlord, bankruptcy attorneys, and IDS storage charges.   Def.'s Mot. to Dismiss to Count V at A142-47.   The other 50% was to be used to pay down a debtor-in-possession loan financed by All American's president, Robert McGuinness.   The Army was not a party in the bankruptcy proceeding, but Beanstalk was one of a number of parties presented with the Bankruptcy Court's "Order Authorizing Distribution of Funds from Net Proceeds of Debtor's Liquidation of Remaining Inventory" and was invited to file any objection with the Bankruptcy Court.   Id. at A138-47.

On August 4, 2010, the Bankruptcy Court entered an order authorizing the sale of certain assets from All American to Authentic.   Id. at A135-37.   The Bankruptcy Court described these assets as (i) the contract rights relating to All American's license with the Army to use the brand name and mark of the Army in connection with the sale of apparel, (ii) related artwork, designs, samples and intangibles, and (iii) computers and other office equipment and furniture.   Id. at A135. The assets excluded from the sale were "all cash, accounts receivable, leases, and existing stock inventory ('Inventory')."   Id. at A126.

Mr. David Wander, All American's attorney in the bankruptcy proceeding, described the sale of All American to Authentic to the Bankruptcy Court at a hearing in August 2010, as follows:

> The sale price is 50,000 dollars.   Originally, the structure of the transaction was going to include an assumption and an assignment of the debtor's license that expires at the end of this year.   There were discussions for an extension of the term as part of the negotiations that the debtors' management was having with the [A]rmy's license agent, the Beanstalk Group.

> Towards the end of the negotiations the [A]rmy decided they wanted to just issue a new license and so the transaction proceeded along those ways.   We carved out 150,000 dollars from the purchase price which would have gone to the [A]rmy to cure the default on post-petition royalties. In effect, that payment is being paid directly by Authentic Apparel.

Def.'s Mot. Summ. J. at A493; see also A495-96.   Mr. Wander also represented that the Army was "on board" with the sale and entering a new License Agreement.   Id. at A494.

**The 2010 Licensing Agreement**

Between June 22 and July 30, 2010, Bob McGuinness, president of Authentic, engaged in negotiations of the 2010 Licensing Agreement by email with Beanstalk representatives, Id. at A440-42, and subsequently Authentic and Beanstalk edited and exchanged drafts of the agreement with the Army's input.   Id. at A244, A336-88.

On August 1, 2010, the Army and Authentic entered into a License Agreement.   Id. at A1. Under the Agreement, the Army granted Authentic a nonexclusive license to use specified Army trademarks, including "U.S. Army," "Army Strong," as well as the Army logo on men's, women's,

and children's clothing to be sold within the United States.  Id. at A29, A33.  Originally, the term of the License Agreement was three years, expiring on December 31, 2013.  Id. at A29.

On April 11, 2011, just over eight months into the 2010 Licensing Agreement, the parties amended this agreement to extend its term by one year, through December 31, 2014, and to add boots and shoes as licensed articles.  Id. at A48.  On May 1, 2011, the parties amended the Agreement again, extending the date by which Authentic was required to achieve $12 million in wholesale sales until June 30, 2014, in order to renew the Agreement for an additional three years. Id. at A50.

**The Army's Request for Approval of Goods Under the 2010 License Agreement**

Under Section 5 of the 2010 License Agreement, Authentic was required to seek the Army's prior approval of any clothing, design, label or promotional or marketing content.  The Army had the "sole and absolute" discretion with respect to both the appearance of Army trademarks and advertising of the trademarked products.  Under Section 5.1, "[p]rior to any sale or distribution" of any items bearing Army trademarks, Authentic was required to "submit to [the Army] all items [bearing Army trademarks] . . . for [the Army's] advance written approval, in [the Army's] sole and absolute discretion[.]"  Id. at A10.  Approval was required for all "products, packaging, labeling, point of sale materials, trade show displays, sales materials and advertising" prior to making sales.  With respect to approvals under the Agreement, Beanstalk was the Army's primary point of contact with Authentic, as Beanstalk was to deal with licensees directly under its agreement with the Army.  See id. at A127, A1208.

Section 5 expressly prohibited Authentic from making any use of, selling, or distributing items listed in section 5.1 "prior to [the Army] granting advance written approval."  Id. at A11.  In addition, the parties agreed that the Army would have 10 business days from receipt to respond in writing to Authentic's submissions.  If the Army did not respond to submissions within 10 business days, submissions were deemed disapproved.  Id.

Section 5.1.8 contained an exculpatory clause which stated:

LICENSEE [Authentic] shall not have any rights against OWNER [the Army] for damages or other remedies by reason of [the Army]'s failure or refusal to grant any approval referred to in this Section 5.

Id. at A11.

Section 14.3, which governed the approval process for promotional and marketing materials, contained a similar exculpatory clause:

LICENSEE [Authentic] shall submit to OWNER [the Army] for authorization and approval in advance all plans and materials relating to print, radio, television and cinema advertising and promotional activities relating to the LICENSED ARTICLES and/or PROPERTY.  All such submissions shall be governed by the procedures set forth in Section 5 above.  [The Army], in its sole discretion, may approve or reject any such advertising or promotional activity, including, but not limited to, the discretion to prohibit [Authentic] from advertising the LICENSED ARTICLES and/or PROPERTY by means of television and/or billboards . . .

[Authentic] shall not have any rights against [the Army] for damages or any other remedy by reason of [the Army]'s failure or refusal to grant approval of any advertising.

Id. at A25.

### The Liquidation of All American's Assets

On September 30, 2010, two months after Authentic entered into the 2010 License Agreement with the Army, the Bankruptcy Court issued an Order authorizing the distribution of funds from the net proceeds of All American's liquidation of remaining inventory to creditors. All American was no longer conducting regular business operations and was in the process of "liquidating its remaining assets, specifically its remaining inventory." Def.'s Mot. to Dismiss Count V at A143.

The Order provided that All American would proceed with inventory liquidation and that the proceeds would be distributed as follows:

(i) $44,380 to IDS, plus all reasonable costs and expenses charged by IDS for storage and shipment of the Inventory (the "Storage and Shipment Costs"), IDS' regular storage and shipment rates being presumed to be reasonable; (ii) after payment in full of $44,380 and the Storage and Shipment Costs to IDS, payment of 50% of the remaining sum to the DIP Lender until the DIP Lender Claim is paid in full; and (iii) the remaining fifty percent, pro rata, (a) to the Landlord on account of the Landlord Administrative Claim until such claim is paid in full, (b) to W&A on account of the W&A Administrative Claim, as and when allowed, until such claim is paid in full, (c) to DMH on account of the DMH Administrative Claim, as and when allowed, until such claim is paid in full, and (d) after payment in full of the DIP Lender Claim, Landlord Administrative Claim, W&A Administrative Claim and DMH Administrative Claim, then to IDS in satisfaction of the Subordinated IDS Lien. Payments to Bankruptcy Counsel shall remain in the Cash Collateral Account pending entry of an order(s) allowing such compensation and reimbursement after proper application and a hearing.

Id. at A146.  The $50,000 in sale proceeds received by All American from Authentic was to be maintained in a cash collateral account that, according to the Bankruptcy Court's Order, was to be used to pay unpaid employee wages and a reduced claim of Robert McGuinness, the Debtor-in-Possession Lender.  Id. at A144.

### Collaboration with 7 Bucks and Partnership with Dwayne "The Rock" Johnson

In late 2012, Authentic began discussions with representatives of celebrity Dwayne "The Rock" Johnson regarding a potential endorsement deal.  Those discussions continued for half a year, concluding with the execution of a Term Sheet with 7 Bucks Entertainment, Inc. ("7 Bucks"), a production company owned by Mr. Johnson and his manager, Dany Garcia.  Def.'s Resp. to Pl.'s Mot. Summ. J. at A1668-71, A1753.  Under the Term Sheet, Authentic agreed to pay Mr. Johnson **[a material amount]**, as well as royalties **[ . . . ]** on its sales of Army-branded products, in exchange for his promotional services.  Id.

During its negotiation of the Term Sheet, Authentic provided 7 Bucks with sales projections and business forecasts indicating that Authentic projected achieving sales of $60 million or more by the end of 2015, and that Authentic would be valued at $45 million to $55 million, resulting in significant financial returns to Dwayne Johnson under the proposed deal. Id. at A1630.  Mr. Reuben testified that internally he was "projecting a lot greater sales" than the projections given to Mr. Johnson. Id. at A1632.  Mr. Reuben testified however that he was aware of no documents reflecting valuations of the company. Id. at A1653.  In October 2013, Authentic represented to 7 Bucks that "all is on track with the Army." Def.'s Mot. Summ. J. at A743; see id. at A1156.

On February 13, 2013, Authentic sent its business plan to 7 Bucks, outlining its plans to build the company by selling items approved by the Army, noting that "[t]o date [Authentic had] received approvals on over 200 different styles." Def.'s Resp. to Pl.'s Mot. Summ. J. at A1758. Mr. Reuben testified in his deposition:

> Q:    When Authentic Apparel was negotiating potential deals with Dwayne ["]The Rock["] Johnson and his people, did Authentic Apparel disclose to them that it had encountered problems obtaining approvals?
>
> A:    Not really.  Because at that point we felt comfortable that we had a line that was saleable and that was approved.  So no use to go back and talk all about the problems we've had.  I think it's common sense that we were trying to get him on board.  We felt confident.  If we didn't feel confident, we wouldn't have put in, you know—you know, we had to pay him **[a material amount]**.  So if we didn't feel the confidence, we wouldn't have done that. So despite these issues, we felt that we are in a good spot to have a reasonable chance of doing a success.

Id. at A1637-38.

As of August 2013, Authentic had repeatedly struggled to meet its royalty payments to the Army.  Id. at A1671-72.  After repeated late payments on September 16, 2013, November 1, 2013, and February 24, 2014, Beanstalk sent Authentic formal notices that it was in material breach of the 2010 License Agreement for failing to pay minimum royalties or deliver royalty reports during related periods in 2013.  Def.'s Mot. Summ. J. at A734, 766, 803-04.  Authentic ultimately paid the minimum royalties through 2013.  Mr. Reuben testified that despite these struggles, Authentic nevertheless entered into the Term Sheet with 7 Bucks committing to make substantial payments to Mr. Johnson because "[w]e needed somebody of the stature of Dwayne Johnson, and we need[ed] to incentivize him."  Def.'s Resp. to Pl.'s Mot. Summ. J. at A1672.  Ultimately, the 7 Bucks Term Sheet was terminated in July 2014.

## Discussion

## Standard of Review

Summary judgment is appropriate where the evidence demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  A genuine issue is one that "may reasonably be resolved in favor of either party."  Liberty Lobby, 477 U.S. at 250.

7

A fact is material if it "might affect the outcome of the suit." Id. at 248. The moving party bears the burden of establishing the absence of any genuine issue of material fact, and any doubt over factual issues will be resolved in favor of the non-moving party. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); SRI Int'l v. Matsushita Elec. Corp., 775 F.2d 1107, 1116 (Fed. Cir. 1985)). Once the moving party's burden is met, the onus shifts to the non-movant, who must present sufficient evidence of a material fact in dispute that would allow a reasonable finder of fact to rule in the non-movant's favor. Liberty Lobby, 477 U.S. at 256-57. The evidence need not ultimately be admissible, but mere denials, conclusory statements, or evidence that is merely colorable or not significantly probative will not defeat summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Liberty Lobby, 477 U.S. at 249-50; Mingus Constructors, 812 F.2d at 1390-91.

A court does not weigh each side's evidence when considering a motion for summary judgment, but "inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Diebold, 369 U.S. at 655). When opposing parties both move for summary judgment, the court reviews the motions under the same standard. First Annapolis Bancorp, Inc. v. United States, 75 Fed.Cl. 263, 275 (2007) (citation omitted). In such instances, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Mingus, 812 F.2d at 1391.

## The Exculpatory Clauses Preclude Plaintiff's Claims Regarding the Army's Failure to Approve Products or Advertising.

Defendant argues that the exculpatory provisions of the 2010 License Agreement—Sections 5.1.8 and 14.3—operate to bar certain of Plaintiff's breach of contract claims as a matter of law.

Section 5.1.8, entitled "Approval Process," provides:

> LICENSEE [Authentic] shall not have any rights against OWNER [the Army] for damages or other remedies by reason of [the Army]'s failure or refusal to grant any approval referred to in this Section 5 [requiring that all products bearing licensed items be approved by the Army].

Def.'s Mot. Summ. J. at A11.

Section 14.3, entitled "Advertising," provides:

> [Authentic] shall not have any rights against [the Army] for damages or any other remedy by reason of [the Army]'s failure or refusal to grant approval of any advertising.

Id. at A25.

In urging this Court to deny liability based upon these exculpatory clauses, Defendant relies upon Wells Bros. Co. v. United States, 254 U.S. 83, 86-87 (1920). In Wells Bros., the Supreme Court enforced an exculpatory clause in a government construction contract providing that "no

claim shall be made or allowed to the contractor for any damages which may arise out of any delay caused by the United States." Id. at 85. Because the Supreme Court viewed this exculpatory clause as "unrestricted," as "comprehensive as words can make it," and "disassociated" from other contract provisions, the Court held that its language could not "be treated as meaningless and futile and read out of the contract." Id. at 87. The Court found that the "plain meaning" of the clause was fatal to Wells Brothers' claim for delay on the contract. Id.

Similar to the clause in Wells Bros., the exculpatory clauses here disavowed any claim challenging the Army's failure to approve garments or advertising, outright in clear, direct, and express language. In the 2010 Licensing Agreement, Authentic agreed both that it would "not have any rights against [the Army] for damages or any other remedy by reason of [the Army]'s failure or refusal to grant any approval" and that it would "not have any rights against [the Army] for damages or any other remedy by reason of [the Army]'s failure or refusal to grant approval of any advertising." Def.'s Mot. Summ. J. at A25.

These exculpatory clauses must be read with Section 5.1, Approval Process, which expressly vested in the Army the "sole and absolute discretion" to approve both garments bearing Army trademarks and advertising relating to such garments. Id. at A10. Section 5.1 of the 2010 Licensing Agreement states:

> Prior to any sale or distribution, [Authentic], at its expense, shall submit to [the Army] all items including, but not limited to, products, packaging, labeling, point of sale materials, trade show displays, sales materials and advertising . . . for [the Army]'s advance written approval, in [the Army]'s sole and absolute discretion[.]

Id. The exculpatory clauses here operated to enforce this separate approval clause and plainly eliminated "any rights against [the Army] for damages or any other remedy by reason of [the Army]'s failure or refusal to grant any approval" of garments or advertising." Id. at A25.

Plaintiff responds that, "the provisions of the Exculpatory Clauses, which legitimately exist to protect the Licensor's marks, do not in any rational world permit the Army—purportedly in the 'exercise of its discretion'—to turn an ordinary trademark license into an illusion." Pl.'s Supp. Memo. at 11. The License, however, was not an illusion; it afforded Authentic an opportunity to use Army marks on hundreds of items in a contractually defined way that protected identified government interests and promoted express public policy goals of enhancing the name, reputation, and public goodwill of the Army. See Department of Defense Directive 5535.09.

## Counts I and II: The Army Reasonably Disapproved Authentic's Submissions

Even assuming arguendo that the exculpatory clauses do not bar Authentic's breach of contract claims regarding the Army's failure to approve products and advertising, Plaintiff's claims fail.

## Plaintiff Has Not Demonstrated that the Army Was Required to Employ the Same Approval Process Under the 2010 Agreement Used Under the 2007 Agreement.

Plaintiff contends that "Defendant breached both the implied and express covenants of good faith and fair dealing" by "completely changing the approval standards by, among other things, imposing 'size' and 'location' requirements for [the logo] that rendered the goods

unmerchantable as compared to the goods with which they had to compete." Pl.'s Mot. Summ. J. 44.

Plaintiff argues that it was "'reasonable' for Plaintiff to have assumed that the approval process (under virtually identical Section 5) under the First License would be the same under the Second License" because the 2007 and 2010 Licensing Agreements were "substantially identical licenses," and "[t]he only differences Plaintiff was told about how the Second License would differ from the First License related to the inability under the Second License to use active duty division and unit emblems." Id. at 38-39. These unwarranted assumptions have no basis in the bargain the parties struck.

First, Plaintiff failed to show that its 2010 Agreement with the Army incorporated approval standards from the Army's 2007 Agreement with All American. The 2010 Agreement was a new contract between different entities. Plaintiff's suggestion that the 2010 Agreement obligated the Army to approve submissions consistent with some undescribed practices under its 2007 Licensing Agreement with All American is meritless. The 2010 Licensing Agreement did not reference either the 2007 Licensing Agreement or the Army's prior relationship with All American. Drafts of the 2010 Agreement and contemporaneous emails, reflecting negotiations, as well as the testimony of All American's bankruptcy attorney Mr. Wander and Authentic's investor Mr. Batheja, indicate that the 2010 Agreement was "new" and separate from the 2007 Agreement between the Army and All American. See Def.'s Mot. Summ. J. at A244, A333, A336, A387-88, A400-42.

Second, because the 2010 Licensing Agreement contained an integration clause, the Court may not rely on evidence of the parties' prior course of dealing—even if there were any such probative evidence—to interpret the contract's provisions. The 2010 Licensing Agreement's integration clause provides:

> This Agreement as executed . . . constitutes the complete and exclusive agreement and understanding between the parties hereto and terminates and supersedes any prior agreement or understanding relating to the subject matter hereof between [the Army] and [Authentic]. [T]here are no representations, discussions, proposals, promises, agreements, warranties, covenants or undertakings, whether oral or written, other than those contained herein.

Id. at A27.

When a document contains an integration clause, no additional terms may be added, whether consistent or inconsistent, through parol evidence. Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320, 1329 (Fed. Cir. 2003); Sterling, Winchester & Long, LLC v. United States, 83 Fed. Cl. 179, 183 (2008); see also McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1434 (Fed. Cir. 1996). Rather, the parol evidence rule bars the use of extrinsic evidence "to supplement or modify a written agreement." TEG-Paradigm Envtl., Inc. v. United States, 465 F.3d 1329, 1339 (Fed. Cir. 2006). Where the contracting parties are commercial or governmental entities, integration clauses are given "particularly great weight." Rumsfeld, 329 F.3d at 1328. In Rumsfeld, the Federal Circuit recognized an integration clause "conclusively establishes that the integration is total unless (a) the document is obviously incomplete or (b) the merger clause was included as a result

of fraud or mistake or any other reason to set aside the contract."  Rumsfeld, 329 F.3d at 1329 (citations omitted).

Plaintiff has proffered no evidence to suggest that the 2010 Licensing Agreement was incomplete, or that the integration clause was included as a result of fraud, mistake, or other reason to set aside the agreement.  Indeed, in Section 21, the 2010 Licensing Agreement states that it was "the product of arms-length negotiations between parties knowledgeable of its subject matter who have had the opportunity to consult counsel concerning the terms and conditions of this Agreement prior to the execution hereof."  Def.'s Mot. Summ. J. at A28.  The circumstances surrounding the negotiation of the 2010 Licensing Agreement indicate that the parties did engage in arms-length negotiations and support a finding of complete integration.  See, e.g., Def.'s Mot. Summ. J. at A244, A336, A387, A440, A932-34; Pl.'s Ex. 93 at 2-3.

### The Army Reasonably Rejected Authentic's Submissions

Authentic alleges in Count I of its Amended Complaint that "the Army consistently breached the [2010 Licensing Agreement] by denying Authentic the right to exploit the goodwill of the Army's registered trademarks by using the licensed Army trademarks as trademarks on all of Authentic's goods, its website and its advertising generally."  Am. Compl. ¶ 121.  However, the undisputed evidence of record establishes that the Army acted reasonably in rejecting certain proposed uses of the marks and advertising.

Beanstalk maintained a web portal that it used to track licensing activities by the Army and licensees.  Def.'s Mot. Summ. J. at A1256.  When seeking the Army's approval of a clothing design, a label, or promotional and marketing content, licensees such as Authentic were required to submit their requests through Beanstalk's web-based portal.  Id.[5]  Once a licensee submitted such a request, the Army could approve it as submitted, instruct the licensee to correct and re-submit the item, or disapprove the item outright.  Id.

Between December 2011 and April 2014, Plaintiff submitted 491 items to Beanstalk's Portal.  Id. at A1257.  Of those, the Army approved 337 as submitted, approved 35 with corrections, requested 68 to be resubmitted with corrections, and denied approval of 41.  Id. Authentic also voluntarily cancelled nine items.  Id.[6]

The Army denied approval or approved certain items with corrections because:

(1)     images were overlapping

(2)     items erroneously indicated that they were manufactured by the United States Army

---

[5]     Authentic submitted some design requests via email.  See, e.g., Def.'s Mot. Summ. J. at A522-23; Def.'s Reply to Pl.'s Resp. to Def.'s Mot. Summ. J. at A1487-88.

[6]     Information stored on Beanstalk's Portal relating to Authentic's product approvals, including images of products and designs, is in the record at BNSTK00000623 - BNSTK00002729.

(3)     items reflected unauthorized creations of a new Army logo or separate brand

(4)     the Army logo was too small or insufficiently used

(5)     Authentic used unapproved marks or improperly altered licensed marks

(6)     Authentic used insignias for existing Army units

(7)     items reflected factual inaccuracies about the Army

(8)     Authentic did not include proper licensing indicators or legal language

(9)     the Army presented aesthetic objections, and

(10)    Authentic did not correctly upload the images of its submissions to the portal.[7]

---

[7]     Beanstalk requested that several items be resubmitted because no image was initially uploaded to Beanstalk's web portal.   BNSTK00000754-756,   BNSTK00000745-747, BNSTK00000764-769, BNSTK00000742-744, BNSTK00000757-759, BNSTK00000795-798, BNSTK00000807-810,   BNSTK00000803-806,   BNSTK00001652-1655,   BNSTK00001644-1647,   BNSTK00001648-1651,   BNSTK00001636-1639,   BNSTK00001640-1643, BNSTK00002010-2012, BNSTK00001756-1761, BNSTK00001930-1936, BNSTK00002007-2009,   BNSTK00001926-1929,   BNSTK00002477-2479,   BNSTK00002560-2562, BNSTK00002119-2123, BNSTK00002142-2146, BNSTK00002232-2236, BNSTK0002307-2312.

## Overlapping Images

The Army objected to designs that included overlapping of logos and text.  For example, Beanstalk commented "please no overlapping, makes the shirt too busy and hard to see the content" with respect to the product design submission below:



BNSTK00001066.   Consequently, on May 2, 2012, Beanstalk deemed the submission "not approved."   Id.   On May 3, 2012, Authentic resubmitted the design, and on May 10, 2012, Beanstalk commented that the design would not be approved because of "too much overlap and not proper usage of the brand."   BNSTK00001071.  On May 15, 2012, Authentic resubmitted the design with corrections, and the item was approved as resubmitted. BNSTK00001066.  See also BNSTK00000775-82,   BNSTK00000910-16,   BNSTK00002635-38,   BNSTK00001435-41, BNSTK00001335-41, BNSTK00002631-34, BNSTK00002704-07, BNSTK00001425-34.

The Army disapproved two items and requested that several items be resubmitted with corrections due to overlapping images.

## Implying Products were Manufactured by the United States Army

On some submissions, Authentic included a tag that read "Manufactured for Authentic Apparel Group," followed by a name line, a serial number, and the phrase, "U.S. Army Trademark."  Beanstalk requested that a number of items be resubmitted with corrections and included the following comment:

> The neck label—we can't imply that this was [manufactured] by the US Army for Authentic Apparel.   You could switch that to "manufactured by Authentic

Apparel."  Also, we can't [say] US Army seals (as shown on the upper left corner of the design).  Please remove.

BNSTK00000775-78.  See also BNSTK00000760-63, BNSTK00000732-39, BNSTK00000856-61, BNSTK00000783-86, BNSTK00000828-33, BNSTK00000841-46, BNSTK00000834-40, BNSTK00000824-27, BNSTK00000789-94, BNSTK00000886-90, BNSTK00000871-74, BNSTK00000881-84, BNSTK00000896-900, BNSTK00000862-70, BNSTK00000847-55, BNSTK00001091-96.

For example, the tag from a t-shirt design is pictured below:



BNSTK00000770.

**Unauthorized Creation of a New Army Logo or Separate Brand**

On September 14, 2010, Ms. Predovan of Beanstalk sent Director of Army Branding, Michael Sullivan, polo shirt designs via email stating: "Please find Authentic Apparel's polo shirt designs attached here for your approval.  Per your recommendation, the patches that they designed feature phantom unit insignia, but are slightly altered to fit in with current market trends.  I look forward to hearing your thoughts on this approach."  Def.'s Mot. Summ. J. at A523.  Mr. Sullivan responded later that day:

Before even opening the attachment your phrase, "current market trends," sent a chill down my spine as I just imagined that the licensee was going to manipulate something we've mentioned several times they COULD NOT manipulate.

a. Numbers 1, 2 and 3 are not approved and in fact are not "slightly altered" as they are not unit insignia . . . be it phantom or otherwise.  They are the creation of new logos, exactly what we told them they couldn't do (see attached document where we clearly stated we would not approved altered designs or new designs), especially 2 and 3.  We approved the use of the phantom insignia to assist licensees with their desire to use what would appear to be authentic Army insignia without using the real thing . . . why is there such an insistence on creating new insignia and logos?

b. Numbers 4 and 5 are OK.

The licensee is clearly living up to my prediction that they would attempt to create a new brand with the "Elite Forces" line. We have clearly communicated that that is not acceptable and I will say it again in case it did not register the first time. There is no "Elite Forces" brand . . . there is only the Army Brand with the Army logo.

My patience is wearing thin with this group . . . we need to get them with the program or make the determination if they really want to be a licensee for the Army.

Id. at 522-23; see also id. at A121, A157, A1274, Def.'s Reply to Pl.'s Resp. to Def.'s Mot. Summ. J. at A1487-88.

### Lack of Prominence of the Army Logo

The Army repeatedly asked Authentic to enlarge the Army's logo or to place it in a more prominent location.  One comment read: "[t]he Army Logo needs to be much bigger on all of your products.  This has been explained in the past."  BNSTK00002197-200.  Others read, "[a]ll of your products need more Army Branding!" and "[p]lease add Army branding to this SKU." BNSTK00002473-76; BNSTK00001005-11.   The Army requested that numerous items be resubmitted with corrections relating to Army branding.  See BNSTK00002161-65 ("The Army Logo needs to be bigger"), BNSTK00000991-97, BNSTK00000998-1004, BNSTK00002045-48, BNSTK00001020-27, BNSTK00002237-40, BNSTK00002386-89, BNSTK00002276-80, BNSTK00002189-92, BNSTK00002185-88, BNSTK00002181-84, BNSTK00002173-76, BNSTK00002177-80, BNSTK00002660-63, BNSTK00002193-96; BNSTK00002621-24, BNSTK00002617-20; BNSTK00002680-83, BNSTK00002700-03, BNSTK00002664-67, BNSTK00002672-75, BNSTK00002649-52, BNSTK00002656-59, BNSTK00002676-79, BNSTK00002393-96, BNSTK00002469-72.

The Army approved the following items with these comments:

- "You need some Army branding on the outside of the product, not just on the inside."  BNSTK00002227-29.

- "Move U.S. Army down to the back pocket flap, and add Army Logo tab to front pocket."  BNSTK00002505-07.

- "Put an Army Logo tab on the front left pocket."  BNSTK00002491-2493.

    Additional items were not approved because there was no Army branding on the outside of the article.  <u>See</u>, BNSTK00002607-2610, BNSTK00002364-2367, BNSTK00002360-2363, BNSTK00002382-2385, BNSTK00002451-2454, BNSTK00002400-2403, BNSTK0002356-2359, and BNSTK00002352-2355.  On the image below for instance, the phrase "U.S. Army" appears on the inside of the shorts' waistband and on a portion of the back pocket flap:



BNSTK00002386; <u>see</u> Def.'s Supp. Br. Reply to Pl.'s Resp. to Def.'s Mot. Summ. J. at A1900, A1902, A1850.

    The Army did not approve items that did not include Army branding on the outside of apparel.  <u>See</u>  BNSTK00002323-26,  BNSTK00002302-06,  BNSTK00002281-88, BNSTK00002313-16,  BNSTK00002331-34,  BNSTK00002335-38,  BNSTK00002407-10, BNSTK00002424-29,  BNSTK00002464-68,  BNSTK00002372-75,  BNSTK00002339-42, BNSTK00002436-39, BNSTK00002484-87, and BNSTK00002480-83.

On the image of the boot below, the U.S. Army logo is 2.04 centimeters by 1.6 centimeters, and the phrase "U.S. Army" can be seen on the tongue.  The Army requested the boot be resubmitted "with a bigger Army Logo":



BNSTK00002173-75, see also Def.'s Mot. Summ. J. at A168-70, A200-03, A1274, Def.'s Reply to Pl.'s Resp. to Def.'s Mot. Summ. J. at A1565-66.

Authentic's principal Ron Reuben believed that placement of large Army logos on garments rendered them less commercially viable.  Def.'s Mot. Summ. J. at A1057.  When Mr. Reuben was asked whether he had any doubt that the Army's position that its logo should be large and featured prominently was taken in good faith, Mr. Reuben responded, "No.  I do not think it was taken—I think it was taken in ignorance.  Okay?  Because no one in their right mind who is licensing apparel would have taken that position if they were familiar with the apparel industry." Id. at A1089; see also id. at A1225, A1237-38, Def.'s Resp. to Pl.'s Mot. Summ. J. at A1708.

### Use of Unapproved Marks

At the Army's behest, Beanstalk disapproved Authentic's use of several emblems and designs that were not included within the Army's style guide, such as:

- A Department of the Army emblem.  BNSTK00000847-55.

- The phrase "U.S.A."  BNSTK00001136-40 ("'U.S.A.' is not in fact a 'U.S. Army' trademark, for that reason this SKU will not be approved.").

- Motorcycles.  BNSTK00001496-1500, BNSTK00001526-32, BNSTK00001682-88, BNSTK00001556-60.

- Scorpions.  BNSTK00002327-30.

- Stars.      BNSTK00001712-19,   BNSTK00001741-45,   BNSTK00001730-36, BNSTK00001705-11, BNSTK00001569-73.

- Snakes.      BNSTK00001505-09,   BNSTK00002547-50,   BNSTK00001316-19 BNSTK00002368-71 (pictured below):



- Eagles outside of the style guide.   BNSTK00000901-905, BNSTK00001324-34 (pictured below):



Beanstalk additionally disapproved alteration of existing Army marks, commenting:

- "Cannot remove the eagle from the U.S. Army Symbol.  Please keep intact.  Or use a different approved eagle from the style guide."  BNSTK00001673-76.

- "You can't alter any Army Marks.   This is too close to the Army symbol."  BNSTK00001656-59.

- "Can't remove the Star from the gold star logo."  BNSTK00001970-72.

- "Cannot alter the Department of Army Vintage Crest Element.  Please keep [intact] with stars per the style guide."  BNSTK00001720-23.

## Use of Active Army Unit Insignias

The Army did not permit Authentic to use insignias related to active Army units or allow Authentic to create its own fictional insignias.  Def.'s Mot. Summ. J. at A524.  Instead, the Army provided "phantom" unit insignias—historical but unused unit insignias.  Id.  Mr. Sullivan wrote that the Army approved "the use of the phantom insignia[s] to assist licensees with their desire to use what would appear to be authentic Army insignia without using the real thing."  Id. at A523.

Beanstalk disapproved Authentic's use of insignias that were not part of the phantom collection that the Army had previously approved, stating:

- "Not approved as per Brand Guidelines.  You cannot create your own unit insignia. Please consult the style guide for phantom unit insignia, that is approved for licensing."  BNSTK00000723-26.

- "13th Armored actually existed and was active during WWII.  We can't use it on licensed products."  BNSTK00000820-23.

- "Is this supposed to be a phantom unit insignia?  If so, the shape and the colors are off.  Please see [included URL] and make a change."  BNSTK00000663-66.

- "Please switch this to a Phantom Unit insignia referenced in the style guide, we are not familiar with this one . . . Thanks."  BNSTK00001751-54.

- "No unit insignia for licensing.  'Tank Corps' and that logo are not to be used on commercial merchandise."  BNSTK00002038-40.

## Factually Incorrect Designs

The Army rejected submissions on the basis of the following inaccuracies:

- "The colors are too close to the U.S. Navy colors."  BNSTK00001586-92.

- "The raising of the flag at Iwo Jima is the Marine Corps, not the Army." BNSTK00001824-28.

- "Air force mark, please change to Army branding per the style guide." BNSTK00001547-51.

- "You need to change the name.  Admiral is a Navy rank equal to a General." BNSTK00002718.

- "([R]emove 'A,' as this is from West Point), switch it to U.S. Army or something relevant to the Army."  BNSTK00002210-12.

**Failure to Include Proper Trademark Identifiers or Legal Language**

Some of the Army's requested corrections pertained to placement of the "trademark" and "registered" symbols. See BNSTK00001435 (Resubmit with corrections: "Add a 'TM' after U.S. Army"), BNSTK00002214 (Resubmit with corrections: "Please change the 'TM' to a 'R' per the new brand guidelines."), BNSTK00002247-54, BNSTK0000221, BNSTK00001363-68, BNSTK00002726-29, BNSTK000002714-17, BNSTK00002495 (Approved with corrections: "Put a registration mark after United States Army vice 'TM'"), BNSTK00002535-38, BNSTK00002513, BNSTK00002539, BNSTK00001383, BNSTK00002517, BNSTK00001767, BNSTK00001762, BNSTK00002002, BNSTK00000658, BNSTK00001052, BNSTK00001080.

**Aesthetic Objections**

Beanstalk, on behalf of the Army, rejected several other submissions for aesthetic reasons or lack of clarity:

- "The Army symbol is too distorted."  BNSTK00001378.

- "Make some space around the Army Logo, and resubmit."  BNSTK00001597-1603;   see   also   BNSTK00001665-1672,   BNSTK00001043-1047, BNSTK00001061-1065,   BNSTK00001037-1042,   BNSTK00001489-95, BNSTK00001446-52,   BNSTK00001989-92,   BNSTK00001877-80, BNSTK00001358-62.

- "What does 'We are Bravo' have to with the U.S. Army?"  BNSTK00001953-56, BNSTK00001963.

- "What does the 'M24' and '57-ACR' stand for?"  BNSTK00000871.

- "What is 'A2C2S'? and why do you say 'Trademark' after U.S. Army?  Explain the a2c2s and remove the word 'trademark.'  Not approved, per the COL at the Army, they do not want this for licensing.  Thanks."  BNSTK00001151, BNSTK00001369.

- "We don't want any object covering up the American Flag" BNSTK00000891 (pictured below):



- "U.S. Army is too distressed on the breastplate.  Can't even read the whole word clearly.  Please make it less distressed."  BNSTK00002668 (pictured below):



Upon review of the extensive record, this Court concludes that the Army's rejection or required corrections of certain Authentic designs were well within its discretion under the Licensing Agreement.  The Army did not breach the Agreement when it rejected items due to incorrect uploading of images to the portal; overlapping logos; the phrase "manufactured for Authentic Apparel Group;" logo size; items, insignias, and images associated with other branches of the military; insignias that related to active Army units; and emblems that had little connection with the Army—such as motorcycles, snakes, and scorpions.  Def.'s Mot. Summ. J. at A522-23.  Finally, the Army reasonably requested that items that did not bear the "trademark" and "registered" symbols be corrected.  Similarly, Plaintiff has not established that the Army breached the Agreement by denying approval for Authentic's proposed advertising, given the broad approval rights the Army retained over advertising of its trademarks.  The Court grants summary judgment in favor of Defendant on Count I of Plaintiff's Amended Complaint.

**Count II: Plaintiff Failed to Establish that the Army Improperly Restricted Use of the MWR Program in Marketing Materials**

In Count II of its Amended Complaint, Plaintiff alleges that the Army breached the 2010 Licensing Agreement by "refus[ing] to permit Authentic to truthfully advertise the relationship between consumers' purchase of Authentic's Army branded goods and contributions to MWR [Morale, Welfare, and Recreation]." Am. Compl. ¶ 136. Plaintiff contends:

> [D]efendant initially restricted and ultimately forbade Plaintiff from referring to the MWR in its advertising. The initial restriction was in the form of insisting on the "official language" relating to the MWR and not allowing a plainer English statement to the effect that buying Army licensed goods helps those whom the MWR helps. Subsequently, Plaintiff was forbidden from referring to the MWR under any circumstances.

Pl.'s Mot. Summ. J. 28-29.[8]  Plaintiff's argument is not supported by the record. Rather, the undisputed evidence establishes that Authentic attempted to make incorrect claims about the MWR, suggesting that the MWR was a charity or that royalty payments were in part donations or charitable contributions.

The MWR program "provides support and leisure services to enhance the lives of Soldiers, their families, military retirees, and other eligible participants through social, fitness, recreational, educational, and other program and activities." Def.'s Mot. Summ. J. at A1272. The MWR program is not a charity—it is a government organization that receives funding from a variety of appropriated funds, user fees, and commercial sponsorships. Id. at A1273, A1197-98.

To avoid confusion among consumers and to prevent licensees from making misleading or inaccurate claims that the MWR program is a charity, or that royalty payments are donations to the MWR program rather than contractually obligated payments, the Army adopted a practice of restricting what licensees could say in their advertising or promotional materials about the MWR program. Id. at A1273, A1197-98, Def.'s Reply to Pl.'s Resp. to Def.'s Mot. Summ. J. at A1548. The Army generally allowed licensees to include only the following, pre-approved statement regarding the MWR program: "By federal law, licensing fees paid to the U.S. Army for use of its trademarks provide support to the Army Trademark Licensing Program, and net licensing revenue is donated to U.S. Army Morale, Welfare, and Recreation." Def.'s Mot. Summ. J. at A1273. In some circumstances, in limited contexts such as press releases, the Army allowed licensees to use the more abbreviated language: "Purchase of Officially licensed U.S. Army merchandise aids the Morale, Welfare, and Recreation (MWR) Program, which benefits the lives of Soldiers, Retirees, and their Families." Def.'s Reply to Pl.'s Resp. to Def.'s Mot. Summ. J. at A1548.

Authentic made repeated efforts to describe the MWR program as philanthropic and to make it a prominent part of its promotional campaign. Def.'s Mot. Summ. J. at A781-782, A987, A1000. In its draft press release introducing Dwayne "The Rock" Johnson as Authentic's spokesperson, Authentic initially described the MWR program as philanthropic. Id. at A768-69, Def.'s Reply to Pl.'s Resp. to Def.'s Mot. Summ. J. at A1498 (The Army crossing out Plaintiff's

---

[8]     Plaintiff alleges that it suffered "money damages" as a result of this breach, but does not specify an amount or offer proof of such damages. Am. Compl. ¶ 137.

description that Dwayne "the Rock" Johnson would "continue the Philanthropic aspect of the brand, where part of the proceeds of the U.S. ARMY licensing fee go to the Morale Welfare and Recreation Organization"), A1500, A1507.

Plaintiff has not demonstrated that the Army breached the Licensing Agreement by requiring that licensees use preapproved language to avoid confusion when describing the MWR program.  Nor has Plaintiff identified any damages it suffered as a result of this alleged breach.

The Court grants summary judgment in favor of Defendant on Count II.

**Plaintiff Failed to Establish that the Army Unreasonably Delayed in Consenting to a Proposed Financing Arrangement.**

Plaintiff alleges in Count III of its Amended Complaint that "by causing Authentic to lose its ability to obtain financing from Samsung and in turn develop a footwear line the Army breached the covenant of good faith and fair dealing thus causing Authentic to suffer millions of dollars in damages." Pl.'s Am. Compl. ¶ 148.[9]  Plaintiff claims that by July 2012, Authentic and Samsung C&T America, Inc. ("Samsung") came to an agreement, pursuant to which Samsung would "finance Authentic's push into the footwear sector" and that Samsung required the Army's consent for Samsung to sell licensed goods in the event of a default by Authentic under the terms of the financing document.  Id. ¶ ¶ 143-44.  Plaintiff alleges that because it took the Army over five months to agree to this pro forma financing document, Authentic lost its ability to obtain financing from Samsung and in turn lost sales as well as the investment it made in developing a footwear line. Id. ¶ 146.  Plaintiff has not established either that the Army had an obligation to approve the financing arrangement within a given timeframe or that the Army unduly delayed in approving the arrangement.

On May 4, 2012, Authentic and the Army entered into a First Amendment to the 2010 Licensing Agreement, which expanded the categories of licensed clothing to include boots and shoes. Def.'s Mot. Summ. J. at A48-49.  Authentic sought—and promptly received from the Army—approval for over 30 footwear designs.  Id. at A1106.  Authentic approached Samsung about a proposed arrangement whereby Samsung would finance Authentic's planned footwear business. Id. at A1105, A1118-21.

On May 17, 2012, Mr. Reuben and Joe Hiess, co-owner of Authentic, on behalf of Authentic, entered into a "Binding Term Sheet" with Anthony Loconte, representing Anthony L&S LLC ("ALS") outlining their understanding that ALS would purchase 5% ownership of Authentic in exchange for a portion of net sales of U.S. Army footwear.  Id. at A590-92, A1115. ALS was a footwear manufacturer with whom Authentic did not have a prior relationship.  Id. at A1118-19.  ALS manufactured shoes in Asia and sold them to customers in the United States. Samsung is ALS's financial partner.  As Mr. Loconte testified, "Samsung owns the inventory that we purchase overseas and bring to the States" and "they own the accounts receivable.  So that's my bank." Def.'s Resp. to Order Attach. 5 at 11.  The term sheet provided that ALS would introduce Authentic to Samsung and use reasonable efforts to assist Authentic "in developing a finance relationship with Samsung." Def.'s Mot. Summ. J. at A591.

---

[9]     Again, Plaintiff failed to quantify damages incurred as a result of this alleged breach.

In December 2012, Authentic requested that the Army consent to a financing arrangement between Authentic and Samsung, but at that time, Authentic did not provide an agreement for the Army's review. Id. at A1274. According to an email exchange, Eric Ruder, Associate General Counsel of Beanstalk, forwarded comments from the Army with regard to a proposed Samsung consent letter to Mr. Reuben on December 5, 2012. Pl.'s Ex. 82. Almost two months later, Mr. Reuben had not responded to these comments. Pl.'s Ex. 82.

On February 6, 2013, the Army was presented with a draft letter that Samsung had prepared regarding the Army's consent to the Samsung-Authentic relationship. Def.'s Mot. Summ. J. at A1251. The letter provided, in part:

> Licensee is entering into an arrangement with Samsung C&T America Inc. ("SCTA") pursuant to which SCTA will provide certain services to Licensee, including inventory purchasing and financing, logistics, warehousing, credit approval, invoicing and account receivable collections, in support of Licensee's activities under the License Agreement. The design, marketing, distribution and sale of the Licensed Articles will continue to be handled by Licensee as will all other obligations including royalty payments. Under such arrangement, SCTA will assume ownership of Licensee's inventory, which includes the Licensed Articles, even though SCTA is not a party to the License Agreement. Licensee is seeking Owner's consent for this arrangement.

> The limitations of Sections 2.4 and 12.1 of the License Agreement notwithstanding, Owner hereby consents to Licensee entering into this arrangement with SCTA and hereby authorizes SCTA to import and sell Licensed Articles in the Licensed Territory under this arrangement, provided, however, that SCTA agrees that any sale of Licensed Articles by it or under its authority shall be governed by all provisions of the License Agreement, including, without limitation, the provisions of Section 3.12, relating to distribution and Section 6.3, relating to Dumping. SCTA's authority to dispose of the Licensed Articles shall expire upon the later of: (i) the expiration or termination of the License Agreement, or (ii) if applicable, the expiration of the sell-off period described in Section 13.3(iii) of the License Agreement.

Id. at 1252 (emphasis in original).

In March 2013, after requesting information from Authentic about the proposed arrangement, the Army learned that Authentic and Samsung had not entered into a contract. Id. at A912-13, A1254, A1275. On March 19, 2013, Mr. Ruder of Beanstalk emailed Michael Sullivan, Paul Jensen, Laurel Queeno, and David Franke of the Army, with answers from Ron Reuben to the Army's questions. Id. at A1254. The email provided, in part, as follows:

**What role does Samsung C&T American have with Authentic?**

Authentic has partnered with Samsung to provide financing, factoring and warehousing. Although all creation and production will be handled by Authentic as licensee, Authentic wants to be able to assure large retailers that it has the ability

to fulfill a large order upon request.  (Comparatively, the one-time order that Sears placed with All American Apparel was $5M).  Samsung provides Authentic with that assurance.  In addition, Ron told us that Samsung has expertise in the footwear category.  In accordance with the current product grant and because of retailer interest, Authentic plans to leverage Samsung's expertise in this area.

**Will Authentic provide us with a copy of the agreement between Authentic and Samsung?**

The agreement between the two parties is a basic factoring and production agreement, which has not yet been drafted.

**Would Samsung be willing to sign this letter agreement which obligates Samsung in the relevant provisions of the US Army license agreement?**

Yes, Ron thought it would not be a problem.

Id.

On May 7, 2013, following the Army's requests for more information, Authentic provided an executive summary of its proposed agreement with Samsung stating:

This letter is to outline the terms under which Samsung C&T America, Inc. ("SCTA") and Authentic Apparel Group, LLC ("Authentic Apparel") are entering into a business arrangement related to footwear products.  In summary, under this business arrangement, SCTA will provide certain services to Authentic Apparel, including inventory purchasing and financing, logistics, importing, warehousing, credit approval, invoicing, and account receivable collections, in exchange for a management fee, which will be a percentage fee based on the gross sales amount. Authentic Apparel will handle all other aspects of the business including product design, factory selection, production and quality control, manufacturing, and marketing and sales of the footwear.  The process of this business arrangement is as follows. Authentic Apparel will select the factories to produce the footwear, and handle the design and all aspects of sourcing of the products.  Authentic Apparel will then request SCTA to open a letter of credit to pay the factory for the merchandise, and SCTA will open the letter of credit as per Authentic Apparel's application.  The factories will invoice SCTA and SCTA will pay the factories for the footwear.  SCTA will have title to the goods and will import the goods into the United States in its name.  Authentic Apparel will contact the customers and handle the marketing of the footwear and soliciting orders from customers.  The orders will be sent to SCTA by Authentic Apparel, and SCTA will then arrange credit approval of the orders and invoice the customers in SCTA's name.  The customers will pay SCTA directly for the goods.  SCTA will also warehouse the footwear and distribute it to customers.  SCTA will then take a management fee for its services (described as above) and pay Authentic Apparel the rest of the sales profits, based on the terms of SCTA and Authentic Apparel's business agreement.

Id. at A1408; see also id. at A1406, A1234-35.

On June 12, 2013, Antonia Predovan of Beanstalk emailed Mr. Reuben, stating, "The Army had a larger meeting regarding [the Samsung Agreement] and the outcome is that they will re-word the letter so that it reads as a more of a mini agreement.  All three parties will need to sign it: Authentic, Samsung, and the Army."  Pl.'s Ex. 5 at 2.  On June 14, 2013, Mr. Reuben emailed Ms. Predovan, "Any update? Time is running . . ."  Id.  On June 25, 2013, Mr. Reuben emailed Ms. Predovan again, complaining about "[t]he delays in resolving this issue."  Id. at 1.  On July 17, 2013, Beanstalk advised Authentic that the Army would counter-sign the letter but asked that Samsung sign it, as well.  Pl.'s Ex. 83 at 1.  On July 25, 2013, the Army counter-signed the consent letter.  Def.'s Mot. Summ. J. at A916.

Although Samsung was willing to finance Authentic's footwear business, the deal never materialized after ALS lost interest and decided to "put their money elsewhere. Id. at A1124-26, A973, A913, A915-17.  Mr. Loconte testified that the sales agreement was "an agreement where Samsung is in charge of the accounts receivable and we're a sales agency," but that there was never agreement as to the specific terms of the sales representative agreement, and the sales representative agreement was never executed.  Def.'s Resp. to Order Attach. 5 at 29.

Jay Lee, who headed the fashion division of Samsung, testified:

Q:     Okay.  So as of July 25, 2013, according to Exhibit 9, you had a signed consent letter from the Army?

A:     Yes.

Q:     Do you think the consent letter from the Army was a reason why the business relationship did not materialize?

A:     I don't think so.

Def.'s Mot. Summ. J. at A916-17.  Mr. Loconte stated, "[T]he problem that I remember is it took a little bit of time for the U.S. Army to basically accept Samsung as the one—the importer of record, I think, the importer of the shoes.  I think that's where the deal went a little cold . . . ."  Def.'s Resp. to Order Attach. 5 at 24.  Mr. Loconte continued:

Q:     Right.  And your best recollection is the deal got cold because there were other opportunities at the time, correct?

A:     Pretty much.  Other opportunities or you know, maybe we weren't as bullish as moving ahead, the economy wasn't the best, buyers were not as receptive to bringing on new brands.  There was a lot of things that change.  This industry is very cyclical.  Business is good next week, it could be—then they have short memories, the business gets bad, nobody wants to buy anything.

Def.'s Mot. Summ. J. at A973.

Plaintiff has not demonstrated that the Army breached the duty of good faith and fair dealing by taking five months to approve Plaintiff's financing agreement.  The covenant of good faith and fair dealing "imposes obligations on both contracting parties that include the duty not to

interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party." Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed. Cir. 2005). Failure to fulfill this duty of good faith and fair dealing constitutes a breach of contract. Metcalf Const. Co. v. United States, 742 F.3d 984, 990 (Fed. Cir. 2014). This duty "applies to the government just as it does to private parties." Centex Corp., 395 F.3d at 1304 (internal citations omitted).

Although a breach of the implied duty of fair dealing does not necessarily require a breach of an express provision of a contract, the duty must be connected to the contract. Metcalf Const. Co., 742 F.3d at 994; Tymshare, Inc. v. Covell, 727 F.2d 1145, 1152 (D.C. Cir. 1984). The Army's duty of good faith and fair dealing under its Licensing Agreement with Authentic did not extend into the separate realm of approving Authentic's financing agreement with Samsung on a timeframe of Authentic's choosing. There is no evidence that the parties contemplated that the Army might be asked to approve a financing arrangement between Authentic and a supplier when they entered the 2010 Licensing Agreement. The gist of the agreement between the Army and Authentic was Authentic's use and advertising of Army trademarks in exchange for royalty payments. The Army was not responsible for facilitating Authentic's ability to obtain financing, and the Licensing Agreement does not reference such financing. Both the financing and the timing of adding the footwear line were business decisions within Authentic's control. Although Samsung wanted to have the Army approve the Samsung-Authentic deal to protect Samsung in the event of Authentic's default on its obligation, Samsung's request did not impose an obligation on the Army with respect to the Authentic Licensing Agreement.

Moreover, the proposed financing arrangement purported to make Samsung an owner, seller, importer, warehouser, and distributor of the licensed footwear. Def.'s Mot. Summ. J. at A1408. Whether or not this arrangement would have been consistent with the parties' Licensing Agreement is not an issue before this Court. But Samsung's potential involvement had been not contemplated by the parties and added a novel issue for the Army. Although Authentic characterizes its proposed deal with Samsung as "garden variety," Pl.'s Mot. Summ. J. at 31, its request for the Army's consent was unprecedented as far as the Army was concerned. Def.'s Mot. Summ. J. at A1274-75. As Mr. Sullivan testified, "To my knowledge, prior to Authentic's request related to Samsung, the Army had never before received a request for consent to a similar arrangement from any of its licensees." Id. at A1275.

In sum, Plaintiff has not established that the Army breached the covenant of good faith and fair dealing by taking some five months to consider and approve Plaintiff's proposed financing arrangement with Samsung. The Court grants summary judgment on Count III of Plaintiff's Amended Complaint in favor of Defendant.

### The Army Reasonably Rejected Authentic's Promotional Videos

In Count IV, Plaintiff alleges that the Army failed to act in good faith by "its unlawful refusal both to permit Reuben to exploit the trademarks it had licensed to Authentic and to exploit [Dwayne 'the Rock'] Johnson as Authentic's lead public marketing spokesperson." Am. Compl. at ¶¶ 187, 205.

**Authentic's Creation of Promotional Videos**

During the fall of 2013 and winter of 2014, Authentic produced several videos to promote its Army branded line of clothing.  Authentic collaborated with a company called Ignited USA ("Ignited") and its president, Eric Johnson, to create videos, with at least one featuring "The Rock."  Def.'s Mot. Summ. J. at A894.  Plaintiff alleges that its business "effectively died when it made little to no sales by the end of 2013," citing its inability to exploit its contract with Dwayne Johnson "that cost it **[a material amount]** because none of the Dwayne Johnson marketing videos had been either approved or disapproved [by Beanstalk] in 2013," and  "the 2013 Holiday Selling Season had been entirely lost."  Pl.'s Mot. Summ. J. 22-23.

In the Spring of 2013, Authentic made a presentation to Beanstalk on its marketing plans to engage Dwayne "The Rock" Johnson.  On April 29, 2013, Ms. Predovan advised Authentic:

> Overall, the Army believes that the presentation you made regarding marketing appears to be a viable strategy.  Please note that every step of the way will need to be approved.  For example, should you decide Dwayne Johnson is a celebrity you would like to use to promote the product, you will have to submit that as a request for approval.  Next, should he want to appear on a talk-show and wear the product, that will have to be approved separately.  Every marketing decision that involves Army product will have to be approved in this fashion.  Same with any decks, POP materials, PR releases, anything that touches the Army brand needs to be approved, as you know.

Pl.'s Ex. 33.

These instructions were consistent with the Licensing Agreement's requirements that Authentic obtain the Army's prior approval for any marketing materials.  The Licensing Agreement expressly provided that "LICENSEE shall submit to OWNER for authorization and approval in advance all plans and materials relating to print, radio, television and cinema advertising and promotional activities relating to the LICENSED ARTICLES and/or PROPERTY."  Def.'s Mot. Summ. J. at A25.  Under Sections 3.12 and 6.3 of the 2010 Licensing Agreement, the Army could prohibit marketing efforts that tarnish, dilute, or adversely impact the reputation and goodwill of the Army.  Id. at A8, A13.

**The Casting Call Video**

Alternatively referred to as "Casting Call," "Callbacks," or "Stand Down Solider," this video advertisement is two minutes and forty-five seconds in length and depicts individuals auditioning for the "U.S. Army line of clothing commercial."  Pl.'s Ex. 25.  The spot opens by displaying a title card featuring Authentic's brand logo.  Id.  Text from the commercial reads, "They thought they were coming in for just another audition."  Id.  The video proceeds to show three auditioning candidates reading from scripts the line, "stand down solider."  Id.  A text card appears stating, "Until this guy showed up."  Id.  Dwayne "The Rock" Johnson is then shown surprising and interacting with those auditioning.  Id.  One of the participants exclaims "stand down soldier" in a forceful manner.  Id.  Dwayne "The Rock" Johnson announces to viewers "the official launch of Authentic Apparel U.S. Army line."  Id.  The Authentic logo is displayed again, and the video concludes as Mr. Johnson departs.  Id.

The Army's Director of Army Branding, Michael Sullivan, testified as to why the Army refused to allow Authentic to use the casting call video spot:

> A:  I saw basically two things that were of concern.  Number one, starting out with the Army brand outfitters for the same reasons we've discussed several times today.  And the other one was a concern with the phrase, "Stand down, soldier."  As being if they're looking for authentic phrases or terminology to use, that's not a phrase we use in the Army.  "Stand down, soldier" is not—it's not a phrase.  It's nothing we use.  It may have been used back in the old days, but it's not something that's been used in the Army any time recently or in the recent past.
>
> *     *     *
>
> Q:  They didn't say it's current, they just said, "Stand down, soldier."  They could have said—
>
> A:  It's not the words "stand down," it's the way you said it in the—it's the way it's being said.  It's—basically you're screaming at somebody.  It's being used in a derogatory sense as if you're yelling at somebody, you're degrading somebody.  Someone's done something and you're telling them, "Stand down, soldier," you're basically disciplining them is what's happening the way it's being depicted there.  That's what's happening.  If you listen to the way that it's being said there, the way these folks are reading it, that's the way I'm—the person who's worn the uniform.  That's the way I'm taking it.

Pl.'s Ex. 56 at 60.  Authentic's Ms. McClennan understood that "it's not flattering evidently within military speak to say Stand Down Soldier.  So we were led to believe that it was not appropriate."  Def.'s Mot. Summ. J. at A1032.

Ultimately, Authentic determined that, "[i]n the greater scheme of things, there were so many other business issues going on at that point in time that how to recover the Casting video was no longer on the top of the list."  Id. at A1033-34.  Authentic thus abandoned its effort to obtain approval to use the "Casting Call" video.  Id. at A1034.

Plaintiff argues that that the Army's failure to approve Authentic's "Casting Call" video "could not have been an act other than in bad faith—either willful bad faith or bad faith imputed by unreasonable blindness to the facts," and that Defendant's purported reason for disapproving of the Casting Call video—its use of the phrase "Stand Down Solider"—was unreasonable or pretextual.  Pl.'s Mot. Summ. J. 37.

Given that the Agreement gave the Army broad discretion in approving advertising, Plaintiff's argument fails.  Mr. Sullivan articulated a rational explanation for his conclusion that the Casting Call video's manner of expressing Stand Down Soldier was inappropriate because it was degrading to the soldier, derogatory, and not a phrase that was used by the Army.  Further, as Ms. McClennan, Authentic's Acting Chief Marketing Officer, testified, Authentic decided to "take [a] leap" and make the video, knowing that ultimately it might not be approved by the Army:

Q:      But you knew that in taking that risk, there was the risk that the Army would
        disapprove of the script and then you will be left with a video that could not
        be used?

A:      Absolutely yep. That was a calculated risk that we took.

Def.'s Motion. Summ. J. at A1035; see id. at A1098-99.

**The Designers Video and the Anthem Video**

On October 9, 2013, Authentic resubmitted a video with corrections to the Beanstalk Portal
described as "an interview with our lead designers." Id. at A773. Alternately titled "Design
Process," "Design," "Designer," "Meet the Designers," and "Heritage," the video is three minutes
and four seconds in length. Pl.'s Ex. 23. The video features Authentic designers David Cockrell,
identified as "Designer," and Pablo Porfirio, identified as "Design Director," discussing the history
of the Army as a fashion trendsetter, Authentic's design philosophy, and materials used to create
Authentic's Army-inspired garments. Id.; Def.'s Mot. Summ. J. at A1050.

On January 13, 2014, Beanstalk transmitted a transcript of the Design Process video to the
Army via an email containing two strikethrough edits. Def.'s Reply to Pl.'s Resp. to Def.'s Mot.
Summ. J. at 1527-28 (showing "TITLE CARD: ~~Army Brand Outfitters~~ Authentic Apparel Group"
and "END CARD: ~~Army Brand Outfitters~~ Authentic Apparel Group"). The video largely follows
the transcript submitted to the Army on January 13, 2014, with the exception that the title and end
cards do not reflect the strikethroughs shown in the January 13 edits. In addition, anywhere
"Authentic Apparel" is used in the transcript, the video includes the phrase, "U.S. Army Brand."
Compare Def.'s Reply to Pl.'s Resp. to Def.'s Mot. Summ. J. at A1527-28 with Pl.'s Ex. 23.
Interspliced between shots of the designer and design director discussing the design philosophy of
Authentic's Army branded line of clothing are shots of military garments bearing numbers that
resemble serial or inventory numbers. Pl.'s Ex. 23.

The Army through Beanstalk asked Authentic to resubmit the video with corrections. The
Army's brand director Mr. Sullivan explained the Army's reasoning:

Q:      Why wasn't this video approved? What was wrong with it to market goods
        that had been approved pursuant to section 5.2 of the second license
        agreement, Plaintiff's Exhibit I?

A:      I'll go back to the conversation we've had pretty much all day in terms of
        the terminology of the Army brand, Army brand outfitters, the—I want to
        say there is one depiction in there of–I'd have to look at it again, but it
        seemed to me as if the picture may have been of World War II era. They
        looked to me as if they were in a Marine Corps uniforms versus an Army
        uniform, but I'd have to look at it again. There is—there is a continuing
        issue that was identified through a lot of product reviews with the use of the
        stamps that had information like patent numbers, NSN numbers, all those
        kinds of things that give the perception to the public that these are items that
        are official items coming off the shelves of Army-owned property.

Pl.'s Ex. 56 at 59.

Alternately titled "Anthem," "Manifesto," "Designer," and "Dwayne Johnson Introductory Video," the video is 52 seconds long, opens with a title card that shows the Authentic logo and the traditional U.S. Army white and yellow star logo.  Pl.'s Ex. 24.  Dwayne Johnson is delivering the following lines, standing in front of a green screen, cameras, monitors, and lighting equipment, arranged to resemble a movie set:

> When you're making a movie, you want to make things look as real as possible. Movies are all about the story, and the best stories come from a very real place, right down to the last detail.  That's what attracted me to the opportunity to work with Authentic Apparel in the creation of the officially approved and licensed U.S. Army Apparel.  This clothing line is inspired by the Authentic gear that has protected our troops for hundreds of years and has also been stylized to look great. In addition, U.S. Army Authentic Apparel supports our troops and their families by donating part of the proceeds to U.S. Army Morale, Welfare, and Recreation program, programs that I strongly believe in.  I wear U.S. Army Authentic Apparel because I honor, love, and support our troops.  And, hey, looking like a total badass doesn't hurt either.

Id.  Images of Authentic garments are interspliced periodically during Mr. Johnson's monologue. Id.

Authentic posted this video on its website, making it available to the public, without obtaining the Army's prior approval.  Def.'s Mot. Summ. J. at A990, A1022-23, A1091-92. Authentic's Ms. McClennan testified at her deposition that, "[t]he Anthem one was on the website, but the website was not promoted yet.  So no one would know it was there.  We were doing it for QA [quality assurance] purposes to make sure everything operated properly."  Id. at A990.  Ms. McClennan further testified that she understood that Beanstalk was expressing concern about this video and she took the video off the website immediately—"within minutes."  Id. at A1022-24. Ms. McClennan explained:

> Because you know, it's all digital. I said you know, just pull it off. You know, it's up for QA, nobody is seeing it. Pull it off.  I don't want to be in any way responsible for violating any of our obligations to the U.S. Army.  I don't want to go there. That would hurt everybody.

Id.  Screenshots from Beanstalk's portal indicate that the Anthem video was initially submitted by Authentic for review by Beanstalk on October 15, 2013, and was approved as submitted by Beanstalk on March 31, 2014.  BNSTK00002574-76.

Plaintiff has not demonstrated that the Army failed to act in good faith by disapproving the Designer and Anthem videos.  Because the Designer Video suggested that the clothing was Army-owned and that Authentic was an Army-Brand outfitter, the Army reasonably concluded that the video was inaccurate.  The Anthem Video misstated that part of the proceeds of clothing sales were being donated to the Army Morale Welfare and Recreation Program.  The Agreement gave the Army discretion to disapprove the use or advertising of Army logos, and the Army reasonably determined that the videos were inconsistent with its stated objectives of licensing Army logos, i.e. to enhance "the name, reputation and public goodwill of the DoD Components."  Department

of Defense Directive 5535.09.   Further, Authentic did not obtain approval from the Army for the videos pursuant to the terms of Section 14.3 of the 2010 Licensing Agreement.

The Court grants summary judgment in favor of Defendant on Count IV.

**The Uncontested Evidence Establishes that the Army Did Not Breach the Covenant of Good Faith and Fair Dealing with Respect to the Womenswear.**

In Count V, Plaintiff alleges that the Army violated the covenant of good faith and fair dealing by refusing to permit Authentic to remove the First Infantry labels from the womenswear "in order to help fund its dire cash needs" and recover the value of the goods. Am. Compl. ¶ 229.[10]

Plaintiff's Count V harks back to All American's 2007 Agreement with the Army.   All American's womenswear garments with First Infantry insignias had originally been approved for sale by the Army under the 2007 Agreement, and All American had contracted with retailers for their sale. Pl.'s Ex. 53 at 67.  However, following criticism by some former members of the First Infantry, the general public and some members of Congress, regarding the commercialization of the First Infantry, the Army informed All American that apparel with the First Infantry Insignia could no longer be produced or sold, but that inventory on hand could be sold until exhausted.  Id. at A170, A177-78.  Following the First Infantry women's garments' removal from circulation in the fall of 2008, these items were stored in IDS' West Coast warehouse.  Eventually IDS obtained a statutory warehouseman's lien against the goods due to the nonpayment of storage fees.  See Def.'s Supp. Br. Reply to Pl.'s Resp. to Def.'s Mot. to Dismiss at A587, A574, A576.

**The 2010 Agreement Imposed No Obligation on the Army with Respect to All American's Womenswear Garments Bearing the First Infantry Insignia.**

By July 2013, Authentic was in dire need of cash as a result of a lack of sales and its obligation under the 2010 License Agreement to pay royalties to the Army.  Plaintiff claims that the Army breached the covenant of good faith and fair dealing implied in the 2010 Licensing Agreement by denying Plaintiff permission to remove the First Infantry insignias from the womenswear garments to allow their resale.  However, the creation of the garments bearing First Infantry insignias occurred under a contract not at issue in this proceeding—a 2007 Licensing Agreement between a defunct entity, All American, and the Army.[11]

---

[10]   Plaintiff seeks judgment in the amount of $430,000—apparently representing the value of All American's womenswear inventory—but failed to submit any evidence supporting the calculation of this amount.

[11]   At the outset of this litigation, Plaintiff represented to the Court that it did not seek compensation related to the First License Agreement.  Indeed, a section of Plaintiff's Response to Defendant's Motion to Dismiss is entitled "Authentic Makes No Claim for Recovery Under the First License Agreement." Compare Pl.'s Resp. at 4 ("Authentic [Apparel] asserts no such claim for recovery under the First License[.]"), with Def.'s Reply at 2 n.2 ("[T]he Government agrees that the issue is now moot.").

The Court expressly memorialized Plaintiff's representation that "[t]he parties subsequently agreed that Authentic Apparel is not seeking to recover under the First License Agreement." Authentic Apparel Grp., LLC v. United States, 123 Fed. Cl. 92, 95 n.5 (2015).

The 2010 Agreement did not encompass or even mention garments bearing First Infantry insignias or any of the apparel that had been in All American's inventory.  Def.'s Mot. Summ. J. at A1-47.  The proceeds from All American's inventory, including First Infantry insignia garments, were governed by Bankruptcy Court Orders, not the 2010 Licensing Agreement which expressly provided that proceeds from the disposition of that inventory were to go to enumerated creditors, that did not include Plaintiff.

Mr. Reuben claimed that in order to help meet Authentic's needs for cash, he, on behalf of All American Apparel, which was no longer conducting operations, "assigned" to Authentic in an undocumented transaction, the right to whatever cash could be recovered from the sale of First Infantry women's garments produced by All American.  The record does not reflect how or when this transaction took place, and it was not reduced to writing.  Hr'g on Def.'s Mot. to Dismiss 29-30 (Jan. 9, 2018) (Plaintiff's counsel stating, "It's all oral . . . [a]nd Mr. Reuben's negotiation with himself, he didn't reduce that to writing either").  The sole support in the record for this assignment is Mr. Reuben's deposition testimony.  See Def.'s Mot. Summ. J. at A404.

It appears that such an assignment would have been prohibited under the terms of both the 2007 License Agreement and the 2010 Agreement.  Section 12.1 of the 2010 Agreement prohibited Authentic from assigning or subleasing "part of all of the agreement":

> This Agreement and all rights and duties herein are personal to LICENSEE and are not assignable, in whole or in part, by LICENSEE without OWNER's prior written consent.  LICENSEE's rights and duties hereunder may not be mortgaged or otherwise encumbered.  Except as provided herein, any grant or attempted grant by LICENSEE of any assignment of part or all of this Agreement, is prohibited, whether it is voluntary or involuntary, by merger, consolidation, dissolution, operation of law, sub license, subcontract, or any other act of LICENSEE which in any way attempts to encumber or transfer, or, in fact, encumbers or transfers any of LICENSEE's rights and obligations hereunder.

Id. at A20.  The 2007 Agreement contained an identical provision.  Def.'s Mot. to Dismiss Count V at A67.

In any event, contrary to Mr. Reuben's unsupported testimony about this oral "assignment" of proceeds of sales of the womenswear garments to Authentic, the record is clear that the All American inventory was not transferred to Authentic as part of the August 2010 asset sale.  All "stock inventory" was expressly excluded from that sale and was never transferred to Authentic.  Def.'s Mot. to Dismiss Count V at A126.  Om Batheja, Authentic's outside investor, testified that Authentic excluded All American's inventory from the purchase agreement because "we didn't want to be involved with the old company," but rather "[w]e wanted to start completely fresh."  Def.'s Resp. to Order Attach. 1 at 162-163.  When asked whether he had any expectation that Authentic would acquire All American's inventory, Mr. Batheja testified "no."  Id.

The record further establishes that there was no reasonable expectation that there would be any "proceeds" from a potential sale of these womenswear garments.  Elizabeth Raoufi, who worked for both All American and Authentic in a variety of positions from 1994 to 2012, including office management and accounting, testified that All American struggled to find buyers for the inventory and concluded it was not worth trying to sell it with logos removed.  Def.'s Reply to

Pl.'s Resp. to Supp. Br. at A479-83; see also id. at A385 (Mr. Reuben stating, "[a]nd really what I understood is we were not able to do anything with [the First Infantry Division Womenswear] goods . . . [a]nd if I was able to translate some of that into funds and cash, I would have gladly done that"). Ms. Raoufi testified that All American "tried to . . . sell it by changing the logos . . . . the Army didn't want us to sell 1st Infantry anymore and so we tried different ways to have patches and logos removed and put new patches on, but it just wasn't very cost efficient." Id. A4782. Ms. Raoufi testified that it was too costly and difficult to remove or cover up patches and that "we wouldn't have made any money by doing that. So most of the garments just sat there in storage." Id.

IDS inquired whether the Army might want to buy the goods, but in an email dated April 30, 2013, an Army attorney responded that the Army did not wish to purchase the goods and that "release at this time of apparel bearing the Army's marks would violate the Army's intellectual property rights. [a]ccordingly, the items may not be sold or otherwise distributed unless all elements bearing Army marks are removed . . . ." Id. On June 14, 2013, IDS advised the Army that IDS notified All American that IDS planned to destroy the goods unless All American paid "all outstanding storage and other fees" by June 24, 2013. Id. at A281, A596. There is no indication in the record that these storage fees were paid, and Plaintiff conceded that Authentic did not have title to the garments. Hr'g on Def.'s Mot. to Dismiss 38 (Jan. 9, 2018).

Nor did the 2010 Agreement cover these womenswear garments. As such, the Army's duty of good faith and fair dealing was not implicated here. What the duty of good faith and fair dealing entails depends on the bargain struck by the parties in the contract itself. Metcalf Const. Co. v. United States, 742 F.3d 984, 991 (Fed. Cir. 2014). The bargain struck in the 2010 Agreement did not encompass First Infantry garments produced by All American, pursuant to a different, earlier agreement whose terms were effectively superseded by All American's subsequent bankruptcy which governed disposition of any proceeds from those garments.

The Court enters summary judgment on Count V in favor of Defendant.

## Defendant's Counterclaim: The Army Is Entitled to Unpaid Royalties on 2014-15 Sales

In its cross-motion for summary judgment, Defendant argued that Authentic owed the Army unpaid royalties in the amount of $41,011.96 for 2014, and the sell-off period, which ran from approximately November 24, 2014 to mid-2015. Def.'s Mot. Summ. J. 57.

In an unusual procedural tack, Plaintiff filed a motion for entry of an order granting Defendant's motion for summary judgment on Defendant's counterclaim. Plaintiff stated that it "admitted all of the material averments of [Defendant's] pleading, namely that it made sales of licensed goods during 2014 and did not remit any Running Royalties in respect of such sales . . . ." Pl.'s Consent Mot. 1. In response to Plaintiff's motion, Defendant agreed that judgment should be entered for Defendant in the amount of $41,011.96, plus interest to be assessed at the end of this case. However, Defendant reserved the right to "put on relevant evidence at trial related to [Plaintiff's] sales and royalty obligations" and to "seek to amend [its] judgment or pursue other appropriate relief in the event that additional evidence related to [Plaintiff's] sales activities is disclosed." Def.'s Resp. to Pl.'s Consent Mot. 2.

Because Defendant expressly reserved its right to adduce evidence on its counterclaim at trial, this Court determined that "there would be no savings by going the summary judgment route, and [that] such a tack could lead to inefficiencies in the form of evidentiary disputes and proceedings to amend judgment." Order 1, Aug. 4, 2017. Because it appeared that the quantum of damages Defendant sought could change, the Court deemed it prudent to defer entering judgment pending further development of the record. On August 4, 2017, this Court denied Plaintiff's motion for entry of an order granting Defendant's motion for summary judgment on its counterclaim.

On August 8, 2017, Plaintiff filed a motion for reconsideration of that order, and the Court denied reconsideration on August 22, 2017. On September 6, 2017, Plaintiff filed a petition for a "supervisory" writ of mandamus in the United States Court of Appeals for the Federal Circuit asking the appellate court to reverse this Court's August 22, 2017 decision refusing to enter judgment on Defendant's counterclaim. The Court of Appeals denied Plaintiff's petition the following day.

On April 10, 2018, Plaintiff again filed a motion for summary judgment on Defendant's counterclaim for a judgment in the sum of $41,011.96, stating that such judgment was appropriate at that time because fact discovery in this case had closed and that there could "be no doubt" that "Defendant is incapable of proving damages on its counterclaim in any sum different than $41,011.96, together with statutory interest." Pl.'s Mot. Summ. J. on Count V 1.

> In its response Defendant represented:

> Initially, we asserted a counterclaim against Authentic Apparel in the amount of $17,980.92, which we then understood to be the amount of unpaid royalties Authentic Apparel owed the Department of the Army (Army) pursuant to its August 1, 2010 license agreement. Having initially told the Army in November 2014 that it had "no intention of making the $17,980.92 payment" to the Army, Authentic Apparel conceded liability on the $17,908.82 counterclaim, but advanced affirmative defenses of fraudulent inducement and set-off. Then, after [Defendant] obtained information from a non-party revealing that Authentic Apparel had made previously unreported sales of Army-trademarked merchandise during 2014 and 2015 totaling $287,888, we amended our answer to reflect the higher amount owed by Authentic Apparel in unpaid royalties ($41,011.96), and set forth allegations related thereto in a cross-motion for summary judgment.

Def.'s Resp. to Pl.'s Mot. Summ. J. on Count V 1-2 (internal citations omitted).

> Defendant continued:

> In our summary judgment motion, we stated that Authentic Apparel reported "no sales" in 2010. In fact, Authentic Apparel's royalty report for the fourth quarter of 2010 reflects sales of $6,128 to Bloomingdale's. We accordingly revise our statement on page 21 of our summary judgment brief (and in our recent supplemental brief) to reflect that Authentic Apparel made $6,128 in sales in 2010, according to its royalty report. We would add, however, that there is some uncertainty in our mind as to Authentic Apparel's actual 2010 sales, given Om

Batheja's testimony that Authentic Apparel placed orders of licensed goods in 2010 to Saks Fifth Avenue, Bloomingdale's, and Nordstrom. While sales resulting in royalties below the minimum royalties due would not affect the amount of our counterclaim, this is yet another reason why evidence related to sales and royalty payments should not be excluded.

Id. at 3 n.1 (internal citations omitted).

In light of Defendant's lack of certainty as to the quantum of its counterclaim, the Court on July 9, 2018, denied Plaintiff's second motion that judgment on Defendant's counterclaim in the amount of $41,011,96 be entered in favor of Defendant.

It appears that there may still be uncertainty as to the quantum of royalties owed on Defendant's counterclaim. However, there is no dispute as to liability, i.e., that Authentic owes the Government unpaid royalties with respect to sales made under the 2010 Licensing Agreement. As such, the Court grants summary judgment as to liability in favor of Defendant on its counterclaim, but defers decision on quantum pending further development of the record.

### Conclusion

Plaintiff's motion for summary judgment on Counts I through V of the Amended Complaint is **DENIED**.

Defendant's cross-motions for summary judgment on Counts I through V are **GRANTED**.

Defendant's motion for summary judgment on its counterclaim is **GRANTED** as to liability. The Court defers decision on damages on Defendant's counterclaim pending further development of the record.

The parties shall file a joint status report proposing any further proceedings on Defendant's counterclaim by **December 13, 2019.**

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Senior Judge**